J-A04010-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| PAUL CALLAHAN | |
| Appellant | No. 1381 EDA 2020 |

Appeal from the PCRA Order Entered June 30, 2020
In the Court of Common Pleas of Bucks County
Criminal Division at No: CP-09-CR-0001168-2015

BEFORE: STABILE, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.:           Filed: September 9, 2021

Appellant, Paul Callahan, appeals from the June 30, 2020, order denying relief pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46. We affirm.

Appellant's conviction arose from his sexual assault of the three young daughters of his live-in girlfriend. Victim T.S. was 10 or 11 years old when the assaults began. She testified that Appellant assaulted her by entering her bedroom after she had gone to sleep, holding her hands over her head, and engaging in sexual intercourse with her. Victim H.S. was 12 years old when the assaults began. On several occasions, Appellant touched her breasts and vagina. He also exposed himself to her. Victim K.S. was nine years old when

_____

[*] Retired Senior Judge assigned to the Superior Court.

Appellant assaulted her. While the two were home with no one else present, Appellant put his mouth on her vagina and engaged in sexual intercourse with her. K.S. later told her mother, Lisa Callahan, of Appellant's behavior after Callahan observed K.S. and Appellant together and suspected that something was wrong. Callahan then took the children to her parents' house and called police.

An examination by a Sexual Assault Nurse Examiner ("SANE") revealed no findings of physical trauma to K.S. But a swab of her vagina revealed saliva with DNA consistent with Appellant's DNA profile. A perianal swab revealed male DNA that excluded Appellant. According to the record, the exclusion meant either that Appellant's DNA was not present in the perianal swab or that the sample contained insufficient data to determine whether Appellant's DNA was present.

On April 30, 2015, a jury found Appellant guilty of two counts of rape of a child, two counts of aggravated indecent assault (complainant less than 13 years of age), three counts of indecent assault (complainant less than 13 years of age), and three counts of unlawful contact with a minor.[1] On February 23, 2016, the trial court imposed an aggregate sentence of 63½ to 127 years of incarceration. The trial court also found that Appellant was a Sexually Violent Predator ("SVP"). On December 22, 2017, this Court affirmed in part and

---

[1] 18 Pa.C.S.A. §§ 3121(c), 3125(a)(7), 3126(a)(7), 6318(a)(1), respectively.

vacated in part his judgment of sentence.[2] On July 2, 2018, the Pennsylvania Supreme Court denied Appellant's allowance of appeal.

Appellant, proceeding *pro se*, filed timely a first PCRA petition on February 20, 2019. Appellant filed an amended, counseled petition on August 28, 2019. The Commonwealth filed its answer on September 27, 2019. On October 29, 2019, the PCRA court issued its notice of intent to dismiss the petition without a hearing pursuant to Pa.R.Crim.P. 907. Appellant filed a *pro se* response on November 15, 2019. Thereafter, counsel filed a "Second Amended Petition for Post-Conviction Collateral Relief in Response to the Court's Rule 907 Notice of Intention to Dismiss Dated October 28, 2019." In this document, counsel reasserted the claims of the original petition and explained that the issues Appellant raised in his *pro se* Rule 907 response lacked merit. The Commonwealth filed an answer on February 12, 2020. On June 30, 2020, the PCRA court entered the order on appeal dismissing the petition. This timely appeal followed.

Appellant presents three questions:

I.      Did the lower court err in denying [Appellant's] claim, without a hearing, that trial counsel was ineffective in his representation for failure to object, to move to strike, to seek a curative or cautionary instruction, or to request pre-trial through a motion *in limine* or otherwise, to preclude the

---

[2]     While Appellant's direct appeal was pending, this Court decided **Commonwealth v. Butler**, 173 A.2d 1212 (Pa. Super. 2017), **reversed**, 226 A.3d 972 (Pa. 2020). Pursuant to this Court's opinion in **Butler** (since reversed), we concluded that Appellant's sentence was illegal insofar as the trial court found him to be an SVP.

Commonwealth's expert SANE nurse, Mary Elizabeth Bangs, from offering her opinion that victim K.S. was sexually abused in violation of 42 Pa.C.S.A. § 5920, and **Commonwealth v. Maconeghy**, (Pa. 2017) (N.T. Trial, April 28, 2015 p.107), when there was no physical evidence of sexual abuse discovered during the nurses examination, the opinion was based upon the oral history as presented to the nurse, the nurse was relying upon [Children's Hospital of Philadelphia ("CHOP")] internal statistics, and the opinion bolstered and suggested to the jury that the nurse witness was of the expert opinion that the victim was credible in her reports?

II. Did the lower court err in denying [Appellant's] claim, without a hearing, that trial counsel was ineffective in his representation for failure to object to Nurse Bang's testimony regarding internal CHOP sex abuse statistics, where no such information, evidence, or documentation of said statistics were turned over by the Commonwealth to the defense in discovery, nor made part of any expert report produced in discovery (N.T. Trial, April 28, 2015, p. 106-07)?

III. Did the lower court err in denying [Appellant's] claim, without a hearing, that trial counsel was ineffective in his representation for failure to call DNA expert witness Katherine Cross, as a witness for the defense to educate the jury regarding DNA evidence from the defense perspective, to rebut the prosecution's DNA evidence, to explain in an exculpatory manner how DNA evidence could have been deposited upon the person of K.S., and to explain whether saliva was actually found, or not, with any certainty on the person of K.S.?

Appellant's Brief at vi.

We must determine whether the trial court committed an error of law and/or whether the record supports the PCRA court's findings of fact. **Commonwealth v. Watkins**, 108 A.3d 692, 701 (Pa. 2014). We review the PCRA court's legal conclusions de novo. **Id.** Where the record supports the

PCRA court's findings of fact, they are binding on this Court. *Id.* To prevail on a claim of ineffective assistance of counsel, a PCRA petitioner must plead and prove by a preponderance of the evidence each of the following: (1) that the underlying issue is of arguable merit; (2) that counsel had no strategic basis in support of the disputed action or inaction; and (3) that counsel's error was prejudicial, *i.e.*, that there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's error. ***Commonwealth v. Spotz***, 84 A.3d 294, 311-12 (Pa. 2014). "[A] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id.* at 312. For purposes of prejudice, "[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." *Id.* The PCRA court may dismiss a petition without a hearing when it is satisfied that there is no genuine issue concerning any material fact and that further proceedings would serve no purpose. Pa.R.Crim.P. 907(1).

In his first argument, Appellant claims counsel was ineffective in failing to object to the Commonwealth's expert's opinion that K.S. was sexually assaulted. Appellant relies on ***Commonwealth v. Maconeghy***, 171 A.3d 707 (Pa. 2017), wherein our Supreme Court held that the Commonwealth's expert—who testified that he believed the victim's account of sexual abuse—invaded the jury's province of determining credibility. That is, the expert

witness should not have been allowed to opine that the victim was telling the truth.

***Maconeghy*** is inapposite here, as the Commonwealth's expert, Mary Elizabeth Bangs, never stated she believed the victim was telling the truth. Rather the expert testified that her examination of K.S.'s vagina revealed no physical trauma, but that the examination was nonetheless consistent with the allegations of sexual abuse:

> Q.    And Miss Bangs, when you were examining [K.S.'s] vagina, did you find any injuries in this case?
>
> A.    No, ma'am, but I wouldn't expect there to be.
>
> Q.    And why not?
>
> A.    So we have database [sic] of the Children's Hospital of Philadelphia which incorporates 600 cases that we have done since the start of our sexual assault response team in 2009.  Of those 600 cases, only 21 percent of those cases showed any type of evidence of physical abuse.
>
> Q.    And is there a medical reason why a child's vagina would not show injury after a sexual assault?
>
> A.    So [K.S.] being only 9 or 10 years old, her vagina is very elastic.  It is very vascular.  There is a lot of blood supply there.  There is a lot of moisture there.  It is major anatomy at that point to move and be elastic.
>
> And because of the blood supply, healing happens very, very quickly.  And often after a sexual abuse if there was any type of trauma there, we often don't see it by the time they present to the – at the hospital.
>
> Q.    How quickly can healing happen?
>
> A.    Very quickly.  Within hours.

Q. So Miss Bangs, in your opinion to a reasonable degree of professional and scientific certainty, was your findings in this case (sic) consistent with sexual abuse?

A. Yes, ma'am.

N.T. Trial, 4/28/15, at 106-07.

Bangs' testimony was unobjectionable pursuant to our Supreme Court's opinion in **Commonwealth v. Minerd**, 753 A.2d 225 (Pa. 2000):

> The question presented in this appeal is whether the Commonwealth may, as part of its case-in-chief in a sexual assault prosecution**, offer the testimony of an expert that the absence of physical trauma is nevertheless consistent with the alleged sexual abuse.** For the reasons stated herein, we hold that such testimony is admissible in the Commonwealth's case-in-chief and accordingly, we affirm.

*Id.* at 227 (emphasis added). The **Minerd** Court noted that the witness was not asked for and did not express an opinion as to whether the victims were telling the truth. *Id.* at 230. The same is true instantly. Further, in **Minerd** the expert's testimony was relevant to explain the absence of evidence of physical trauma, without which the jurors might have drawn an unwarranted negative inference against the Commonwealth. *Id.* at 231. Again, the same is true here. Bangs testified, precisely in accord with **Minerd**, that her examination revealed no physical injury to K.S., but that a finding of no physical injury was consistent with sexual assault. We discern no arguable merit to this issue.

In his second argument, Appellant claims counsel was ineffective for failing to object to Bangs' use of statistics from a Children's Hospital of

Philadelphia ("CHOP") database. As quoted above, Bangs said that only 21 percent of sexual assault examinations since 2009 showed physical evidence of abuse. N.T. Trial, 4/28/15, at 107. Appellant fails to support this argument with citation to pertinent authority, and therefore he has waived it. Pa.R.A.P. 2119(b); *Commonwealth v. Mulkin*, 228 A.3d 913, 917 (Pa. Super. 2020). Were we to address this argument on the merits, we would affirm for the reasons explained on pages 14 through 17 of the PCRA court's August 11, 2020, opinion.

In Appellant's final argument, he claims counsel was ineffective for failing to call Katherine L. Cross as a DNA expert for the defense. Appellant claims Cross would have helped refute the Commonwealth's DNA evidence implicating Appellant in the assault of K.S.

> When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and prejudice requirements of the [*Strickland v. Washington*, 466 U.S. 668] test by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*Commonwealth v. Matias*, 63 A.3d 807, 810–11 (Pa. Super. 2013), *appeal denied*, 74 A.3d 1030 (Pa. 2013). Of these elements, only prejudice is presently at issue. To demonstrate prejudice, Appellant must show how Cross's testimony would have been beneficial in this case. *Id.*

Appellant attached to his petition a copy of Cross's June 3, 2019, report. In his brief, however, he fails to cite to the report or develop any argument as to how Cross's testimony based on her report would have been beneficial. For this reason, Appellant has waived his third argument. Pa.R.A.P. .2119(c); ***Commonwealth v. Harris***, 979 A.2d 387, 396 (Pa. Super. 2009). Were we to address the merits of this issue, we would affirm based on the PCRA court's opinion. In its review of Cross's report, the PCRA court explains that the Cross report contains no evidence that was not presented to the jury. PCRA Court Opinion, 8/11/2020, at 18-19. Further, the PCRA court notes that defense counsel was able to use Cross's report during cross examination of the Commonwealth's DNA expert. ***Id.*** at 19. We would conclude, along with the PCRA court, that Appellant has failed to allege any basis upon which Cross's testimony would have been beneficial to him at trial.

For the foregoing reasons, we affirm the PCRA court's order. We direct that a copy of the PCRA court's August 11, 2020, opinion be filed along with this memorandum.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/9/21

- 9 -

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :   No.   **CP-09-CR-0001168-2015**
                                         **[1381 EDA 2020]**

v.          :

PAUL CALLAHAN          :

### OPINION

Petitioner, Paul Callahan, filed an appeal from this Court's Order dated June 30, 2020, denying his request for relief pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§9541 *et seq.*, without a hearing.

### Factual and Procedural History

On April 30, 2015, following a trial by jury, Petitioner was convicted of eleven felony offenses for sexually assaulting his three stepdaughters, T.S., H.S., and K.S., over a period of years. As a result of his sexual abuse of T.S., Petitioner was convicted of: Rape of a Child, 18 Pa.C.S. § 3121(c); Aggravated Indecent Assault – complainant less than 13 years of age, 18 Pa.C.S. § 3125(a)(7); Indecent Assault – complainant less than 13 years of age, 18 Pa.C.S. § 3126(a)(7); and Unlawful Contact with a Minor for the purpose of engaging in each of the aforementioned sexual offenses, 18 Pa.C.S. § 6318(a)(1). As a result of his sexual abuse of H.S., Petitioner was convicted of: Indecent Assault – complainant less than 13 years of age and Unlawful Contact with a Minor for the purpose of engaging in the aforementioned sexual offense. As a result of his sexual abuse of K.S., Petitioner was convicted of: Rape of a Child; Involuntary Deviate Sexual Intercourse with a Child, 18 Pa.C.S. § 3123(b); Aggravated Indecent Assault – complainant less than 13 years of age; Indecent Assault – complainant less than 13 years of age; and Unlawful Contact with a Minor for the purpose of engaging in each of the aforementioned sexual offenses.

The evidence introduced at trial was summarized as follows for purpose of direct appeal:

T.S. was 19 years old at the time of trial. When she was six years old, she and her two younger sisters, H.S. and K.S., their mother, Lisa Callahan, and [Petitioner] began living together at the Orangewood Apartments located in Bristol Township, Bucks County. T.S. testified that, shortly after they began living together, [Petitioner] began to "slap" her buttocks. Although T.S. reported this touching to her mother, [Petitioner] continued to engage in this inappropriate contact with T.S. and later began to engage in the same behavior with H.S. and K.S. During this same period of time, [Petitioner] approached T.S. while she was alone in the kitchen of the apartment and told her that men grow hair on their private parts. He then began to pull down his pants, exposing his pubic hair, but stopped when T.S. began to cry and "freak out." [Petitioner] made T.S. promise not to tell anyone about what he had done.

T.S. testified that [Petitioner] raped her on multiple occasions after the family moved to a residence in the Junewood section of Bristol Township. The first incident occurred when T.S. was approximately 10 or 11 years old. [Petitioner] entered her bedroom after she had gone to sleep for the night. [Petitioner] held her hands above her head and proceeded to engage in sexual intercourse with her. T.S. kept her eyes closed throughout the incident but was able to describe in detail what she heard and felt. She recalled that after another such assault, she washed blood from her sheets. She did not report the abuse. Rather, she repeatedly told herself that she had dreamed each sexual encounter. She abandoned that self-deception when she turned 17, moved out of the family home and began to see a therapist.

At the time of trial, H.S. was 16 years old. She was three years old when she began to live with [Petitioner] at the Orangewood Apartments. [Petitioner's] first sexual contact with H.S. occurred at the Junewood residence when H.S. was 12 years old. H.S. had been sitting in the living room on the couch watching television when [Petitioner] sat down next to her and put his hand in her pants and touched her vagina. H.S. testified that she was scared and that he told her not to tell anybody. She testified that she did not tell anyone about the incident because she loved him and "didn't want to get him in trouble."

H.S. recounted a number of additional incidents involving inappropriate sexual activity. [Petitioner] regularly slapped H.S. on her buttocks. On one occasion, [Petitioner] talked to her about pubic hair on "guys and girls" and told her that, "guys do not like it when girls have hair down there." On another occasion, [Petitioner] showed her his penis. On two occasions, [Petitioner] grabbed H.S.'s

2

breast, once on the living room couch and once in her bedroom when she was trying to sleep. Once again, [Petitioner] instructed her not to tell anyone about what had occurred.

When H.S. was approximately fifteen or sixteen years old, [Petitioner] touched her thigh near her vagina, once while they were in the car and once while they were in the living room of their home. Both times, he told H.S. not to tell anyone about what he did.

In October of 2014, H.S. was 16 years old. The family was then living in Holly Hill, Bristol Township. During that period of time, [Petitioner] entered her bedroom while she was sleeping and put his hand down her pants, touching her vagina. Neither person spoke. H.S. testified that she did not know what to do, so she just tried to go back to sleep until he left.

K.S. was one year old when she began to live with [Petitioner]. At the time of trial, K.S. was 14 years old. On Christmas Day, 2010, K.S.'s mother and sisters went to a Christmas party. K.S. remained at home because she was sick. [Petitioner] also remained at home for the ostensible purpose of taking care of her. While they were alone, [Petitioner] had sexual intercourse with K.S. on the living room couch, placing his mouth on her vagina and then inserting his penis. K.S. was nine years old at the time.

On February 9, 2011, Lisa Callahan walked out onto the patio of her home and saw [Petitioner] and K.S. sitting behind the bar. Sensing that something was wrong, she asked [Petitioner] and K.S. what was happening. [Petitioner] responded by saying "Nothing." K.S. said, "Just listening to music" and then went inside the house. Lisa Callahan again confronted [Petitioner] about what was happening. Suspicious that something of a sexual nature was occurring, Lisa Callahan grabbed him to see if he had an erection. She testified that [Petitioner] was semi-erect. [Petitioner] then went inside, saying that he had to use the bathroom. When he did not return, Lisa Callahan went inside and found [Petitioner] and K.S. standing close together in the laundry room. When Lisa Callahan entered, [Petitioner] jumped back. Lisa Callahan demanded to know what was happening. Both K.S. and [Petitioner] again claimed that nothing was going on. When Lisa Callahan continued to press K.S., K.S. told her, "I can't tell you, because I don't want to get him in trouble." Lisa Callahan asked [Petitioner] to go on the back porch, so she could speak with K.S. After he walked out onto the patio, Lisa Callahan locked the door. K.S. then told her that [Petitioner] had put his fingers in her vagina, and said, "Does this feel good? This is what me and mommy do." K.S. watched as her mother became hysterical and [Petitioner], who had reentered the home through another door, began yelling at K.S., accusing her of lying.

3

Lisa Callahan took the children to her parents' house, at which time the police were called. K.S. was taken to the Children's Hospital of Philadelphia for an examination by a Sexual Assault Nurse Examiner ("SANE"). Because no vaginal injuries were found, Lisa Callahan and K.S. were told that there were "no findings." K.S.'s mouth, vulva, vagina, rectum, and the area around her anus were swabbed. The next day, K.S. overheard her mother and her grandfather discussing the fact that there were "no findings." While at the grandparents' home, Lisa Callahan repeatedly asked K.S. if she had made up the story telling her that "if she was lying, an innocent man could die in jail and that would be K.S.'s fault." K.S. concluded that no one, including her mother, believed her. She therefore recanted her statement. The swabs taken during the sexual assault examination were placed in evidence, untested. Approximately a week-and-a-half later, [Petitioner] returned to the family home. Shortly thereafter, [Petitioner] once again began to sexually abuse K.S.. When he did so, he told K.S. that he missed her body. [Petitioner] would continue to abuse K.S. for the next three years. While she was nine, ten, eleven and twelve years old, [Petitioner] repeatedly placed his fingers, mouth and penis in K.S.'s vagina. K.S. testified that [Petitioner] vaginally raped her in the bedroom he shared with her mother. She testified that [Petitioner] frequently placed her hand on his penis and moved it up and down.

In October of 2014, Lisa Callahan again caught [Petitioner] having inappropriate sexual contact with K.S. On this occasion, Lisa Callahan and [Petitioner] had been out at a bar. When they returned home, K.S. was on the couch. Lisa Callahan went into her bedroom to change clothes. When she noticed that [Petitioner] and her daughter were suddenly silent, she returned to the living room and saw [Petitioner] standing over K.S. K.S. testified that [Petitioner] had been trying to put his tongue in her mouth when her mother walked into the room. Lisa Callahan testified that when she entered the room, [Petitioner] jumped back and K.S. threw her blanket over her head. Lisa Callahan asked, "What is going on?" K.S. was crying but said, "Nothing." When Lisa Callahan repeated her question, K.S. told her, "He tried kissing me, putting his tongue in my mouth." Once again Lisa Callahan reacted hysterically and [Petitioner] immediately accused K.S. of lying. K.S. told him to stop lying to her mother. The next day, Lisa Callahan and [Petitioner] acted as if nothing had happened. Lisa Callahan took no action to protect her daughter.

Shortly after this incident between K.S. and [Petitioner], H.S. sent a text message to her sister T.S. who, at that point, was no longer living with [Petitioner]. The text message read, "What if I told you that somebody is touching me in a way that I am not comfortable with

and I don't know what to do?" T.S. picked H.S. up from school and took her to their biological father's home. The police were then contacted. T.S., H.S. and K.S. were thereafter interviewed. All three sisters reported sexual abuse. At that time, the swabs that had been collected during the sexual assault examination of K.S. in February of 2011 were submitted for analysis.

The rectal, perianal and the vulva swabs tested positive for saliva. The perianal and vulva swabs contained male DNA. A partial DNA profile consistent with that of [Petitioner] was found on the vulva swab. A comparison of [Petitioner's] DNA with the male DNA found in the perianal swab was reported as "excluding" [Petitioner], meaning either [Petitioner's] DNA was not present in the sample or the sample contained insufficient data to determine whether his DNA was present.

Opinion (direct appeal), 5/27/16, at 2-8 (citations to notes of testimony omitted).

Sentencing was deferred for Petitioner to be evaluated by the Sexual Offender Assessment Board ("SOAB") pursuant to 42 Pa.C.S. § 9799.24. On September 2, 2015, this Court found Petitioner to be a Sexually Violent Predator ("SVP") (N.T. 9/2/15, at 41) and imposed sentence. (N.T. 9/2/15, at 68-93). Following imposition of sentence, trial counsel was granted leave to withdraw his entry of appearance and new counsel was appointed. On September 11, 2015, Petitioner filed post-sentence motions. On December 24, 2015, Petitioner filed amended post-sentence motions. On February 3, 2016, this Court reconsidered the sentence originally imposed and sentenced Petitioner to an aggregate term of incarceration of 63 ½ to 127 years.[1]

---

[1] With regard to the crimes committed against T.S., sentence was imposed as follows:
    Rape of a Child – 20 to 40 years;
    Aggravated Indecent Assault – no further penalty imposed;
    Indecent Assault – no further penalty imposed;
    Unlawful Contact with Minor – no further penalty imposed.
With regard to the crimes committed against H.S., sentence was imposed as follows:
    Unlawful Contact with a Minor – 3 ½ to 7 years;
    Indecent Assault – no further penalty imposed.
With regard to the crimes committed against K.S., sentence was imposed as follows:
    Rape of a Child – 20 to 40 years;
    Involuntary Deviate Sexual Intercourse with a Child – 20 to 40 years;
    Aggravated Indecent Assault – no further penalty imposed;
    Indecent Assault – no further penalty imposed;
    Unlawful Contact with a Minor – no further penalty imposed.

Petitioner thereafter filed a timely appeal from the judgment of sentence. On December 22, 2017, the Superior Court affirmed the judgment of sentence in part and vacated in part. Specifically, the Court concluded that Petitioner's designation as an SVP constituted an illegal sentence and reversed that order pursuant to Commonwealth v. Butler, 173 A.3d 1212 (Pa.Super. 2017), rev'd, 226 A.3d 972 (Pa. 2020) and remanded the matter for issuance of notice of his registration obligations under 42 Pa.C.S. § 9799.23. On January 19, 2018, Petitioner filed a petition for allowance of appeal in the Supreme Court. On July 2, 2019, the Supreme Court denied that petition. On October 17, 2018, Petitioner appeared before this Court for purposes of receiving sexual offender registration notification.

On February 28, 2019, Petitioner filed a timely, *pro se* Motion for Post Conviction Collateral Relief. By Order dated May 15, 2019, this Court appointed Patrick J. McMenamin, Jr. Esquire ("PCRA Counsel"), to review the *pro se* motion and to either file a counseled PCRA petition or otherwise respond in accordance with the PCRA and applicable case law. On August 28, 2019, Petitioner filed an "Amended Petition for Post-Conviction Collateral Relief" ("Amended Petition"). On September 27, 2019, the Commonwealth filed its Answer to the Amended Petition.

On October 29, 2019, this Court issued a Notice of Intent to Dismiss Petitioner's Amended Petition without a hearing pursuant to Pa.R.Crim.P. 907. On January 13, 2020, PCRA Counsel filed a "Second Amended Petition for Post-Conviction Collateral Relief in Response to this Court's Rule 907 Notice of Intention to Dismiss" ("Second Amended Petition/Rule 907 Response"). On February 12, 2020, the Commonwealth filed an Answer to the Second Amended Petition/Rule 907 Response, incorporating by reference its previous filed Answer. On June 30, 2020, this Court entered an Order denying Petitioner's request for PCRA relief.

6

On July 9, 2020, Petitioner filed notice of appeal. By Order dated July 10, 2020, Petitioner was directed to file a concise Statement of Matters Complained of on Appeal ("Statement"). On July 20, 2020, Petitioner filed his Statement.

## Discussion

Petitioner raises the following claims in his Statement:

1. The lower court erred in denying [Petitioner's] claim, without a hearing, that trial counsel was ineffective in his representation for failure to object, to move to strike, to seek a curative or cautionary instruction, or to request pre-trial through a Motion *in Limine* or otherwise, to preclude the Commonwealth's SANE nurse, Mary Elizabeth Bangs, from offering her opinion that victim K.S. was sexually abused in violation of 42 Pa.C.S. § 5920, and Commonwealth v. Maconeghy, 171 A.3d 707 (Pa. 2017) (N.T., Trial, April 28, 2015, p. 107), when there was no physical evidence of sexual abuse discovered during the nurse's examination, the opinion was based upon the oral history as presented to the nurse, the nurse was relying upon CHOP internal statistics, and the opinion bolstered and suggested to the jury that the nurse witness was of the expert opinion that the victim was credible in her reports.

2. The lower court erred in denying [Petitioner's] claim, without a hearing, that trial counsel was ineffective in his representation for failure to object to Nurse Bang's testimony regarding internal CHOP sex abuse statistics, where no such information, evidence, or documentation of said statistics were turned over by the Commonwealth to the defense in discovery, nor made part of any expert report produced in discovery (N.T., Trial, April 28, 2015, p. 106-107).

3. The lower court erred in denying [Petitioner's] claim, without a hearing, that trial counsel was ineffective in his representation for failure to call DNA expert witness Katherine Cross, as a witness for the defense to educate the jury regarding DNA evidence from the defense perspective, to rebut the prosecution's DNA evidence, to explain in an exculpatory manner how DNA evidence could have been deposited upon the person of K.S., and to explain whether "saliva" was actually found, or not, with any certainty on the person of K.S.

Statement, at 1-2.

7

To obtain PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his conviction and/or sentence resulted from one or more of the enumerated grounds for relief set forth in 42 Pa.C.S. § 9543(a)(2); that his claims were not previously litigated or waived, 42 Pa.C.S. § 9543(a)(3); and that the failure to litigate the issue prior to or during trial or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel, 42 Pa.C.S. § 9543(a)(4); Commonwealth v. Reid, 627 Pa. 151, 169, 99 A.3d 470, 481 (Pa. 2014). In the instant case, Petitioner relied on 42 Pa.C.S. § 9543(a)(2)(ii), ineffective assistance of counsel, as his sole basis for relief.

The standards applicable to claims of ineffective assistance of counsel are well established. Counsel's performance is presumed to be constitutionally adequate. Commonwealth v. Smith, 609 Pa. 605, 623, 17 A.3d 873, 883 (Pa. 2011). To prevail on an ineffectiveness claim, a petitioner must satisfy, by a preponderance of the evidence, the performance and prejudice standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Specifically, a petitioner must establish the following:

> (1) that the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. Commonwealth v. Pierce, 567 Pa. 186, 786 A.2d 203, 213 (2001).

Commonwealth v. Spotz, 587 Pa. 1, 32-33, 896 A.2d 1191, 1209-10 (Pa. 2006). Where a petitioner has failed to meet any of the three distinct prongs of the ineffective assistance of counsel test, the claim may be disposed of on that basis alone, without a determination of whether the other two prongs have been met. Commonwealth v. Basemore, 560 Pa. 258, 294, 744 A.2d 717, 738 n.23 (Pa. 2000). "Moreover, a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; if a claim fails under any necessary element of the *Strickland*

8

test, the court may proceed to that element first." Commonwealth v. Cousar, 638 Pa. 171, 187-188, 154 A.3d 287, 297 (Pa. 2017). Counsel may not be deemed ineffective for failing to raise meritless claims. Commonwealth v. Wright, 599 Pa. 270, 321, 961 A.2d 119, 149 (Pa. 2008).

"There is no absolute right to an evidentiary hearing on a PCRA petition." Commonwealth v. Jones, 942 A.2d 903, 906 (Pa.Super. 2008). A PCRA petition may be dismissed without a hearing if the court is satisfied "there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings." Commonwealth v. Roney, 622 Pa. 1, 17, 79 A.3d 595, 604 (Pa. 2013) (citation and quotation marks omitted). "To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." Commonwealth v. Roney, 79 A.3d at 604-05 (quoting Commonwealth v. D'Amato, 579 Pa. 490, 856 A.2d 806, 820 (Pa. 2004)). In other words, "if the PCRA court can determine from the record that no genuine issues of material fact exist, then a hearing is not necessary." Commonwealth v. Jones, 942 A.2d at 906. "As to ineffectiveness claims in particular, if the record reflects that the underlying issue is of no arguable merit or no prejudice resulted, no evidentiary hearing on a post-conviction claim is required." Commonwealth v. Baumhammers, 625 Pa. 354, 385, 92 A.3d 708, 726–27 (Pa. 2014) (citation omitted).

In the instant case, Petitioner asserts as to each of his claims of ineffective assistance of counsel that this Court erred in deciding the claim without a hearing. He does not, however, identify any genuine issue of material fact in his Amended Petition, his Second Amended Petition/Rule 907 Response or in his Statement. He merely asserts,

> "[a]n evidentiary hearing is required, and requested, as the truth, accuracy or veracity of the aforementioned allegation brought forth

9

by Petitioner cannot be determined in their entirety from the record as they involve matters that, in part, call into question the statements, advice, opinion, and representation of counsel, expressed and provided to Petitioner, and therefore an evidentiary hearing is necessary to allow the Court to assess the claims and the credibility of same.

Amended Petition, ¶ 20; Second Amended Petition/Rule 907 Response, ¶ 23. As the analysis set forth below makes clear, resolution of Petitioner's claims did not require any determination as to credibility and there is no dispute as to any of the facts that are material to the resolution of Petitioner's claims. The record established that Petitioner's claims lack merit and/or that Petitioner was not prejudiced as a result of counsel's alleged inadequacies. A hearing was therefore not necessary.

### Nurse Bangs' Testimony

Petitioner asserts that trial counsel was ineffective for failing to "preclude the Commonwealth's SANE nurse, Mary Elizabeth Bangs, from offering her opinion that victim K.S. was sexually abused in violation of 42 Pa.C.S. § 5920, and Commonwealth v. Maconeghy, 642 Pa. 770, 171 A.3d 707 (Pa. 2017)." Amended Petition, ¶ 15a; Second Amended Petition/Rule 907 Response, ¶ 15a-g; Statement, ¶ 1. The specific testimony about which Petitioner complains occurred during the prosecutor's direct examination as follows:

Q:   And Miss Bangs, when you were examining [K.S.'s] vagina, did you find any injuries in this case?

A:   No, ma'am, but I wouldn't expect there to be.

Q:   And why not?

A:   So we have a database of the Children's Hospital of Philadelphia which incorporates 600 cases that we have done since the start of our sexual assault response team in 2009. Of those 600 cases, only 21 percent of those cases showed any type of evidence of physical abuse.

10

Q: And is there a medical reason why a child's vagina would not show injury after a sexual assault?

A: So [K.S.] being only 9 or 10 years old, her vagina is very elastic. It is very vascular. There is a lot of blood supply there. There is a lot of moisture there. It is major anatomy at that point to move and to be elastic. And because the blood supply, healing happens very, very quickly. And often after a sexual abuse if there was any type of trauma there, we often don't see it by the time they present to the – at the hospital.

Q: How quickly can healing happen?

A: Very quickly. Within hours.

Q: So Miss Bangs, in your opinion to a reasonable degree of professional and scientific certainty, was your findings in this case (sic) consistent with sexual abuse?

A: Yea, ma'am.

(N.T. 4/28/15, at 106-107) (emphasis added).

Section 5920 provides, in relevant part, that a "witness's opinion regarding the credibility of any other witness, including the victim, shall not be admissible." 42 Pa.C.S. § 5920(b)(3). Maconeghy held that "an expert witness may not express an opinion that a particular complainant was a victim of sexual assault based upon witness accounts couched as history." Commonwealth v. Maconeghy, 642 Pa. at 779, 171 A.3d at 712.

Addressing the first prong of the ineffectiveness test, Petitioner's claim that such testimony was objectionable is without merit. The witness simply did not offer an opinion as to whether K.S. was truthful or whether she was, in fact, the victim of sexual assault. She testified that her examination of K.S. did not reveal any physical injury but that the lack of injury had a medical explanation. She therefore properly concluded that the absence of physical injury was "consistent with sexual abuse." Such testimony is permissible. Commonwealth v. Minerd, 562 Pa. 46, 50,

11

753 A.2d 225, 227 (Pa. 2000) (a medical professional may offer testimony "...that the absence of physical trauma is nevertheless consistent with the alleged sexual abuse." (emphasis added)); Commonwealth v. Johnson, 690 A.2d 274, 275, (Pa.Super. 1997) (*en banc*) (held, testimony that the absence of evidence of physical trauma is consistent with incidents of sexual abuse is admissible stating, "[w]ithout such an explanation, jurors may improperly draw a negative inference against the Commonwealth, based upon a layperson's untutored assumptions, and rely upon that inference in rendering a verdict.").

Petitioner nonetheless argues that Nurse Bangs' testimony impermissibly bolstered K.S.'s credibility and "suggested to the jury that the nurse witness was of the expert opinion that the victim was credible in her reports." Amended Petition, ¶ 15a; Second Amended Petition/Rule 907 Response, ¶ 15a-g; Statement, ¶ 1. This argument was rejected by the Court in Minerd. In that case, the Commonwealth presented the testimony of a qualified medical expert in obstetrics and gynecology as part of its case-in-chief during a sexual assault prosecution. Minerd, 562 Pa. at 50-51, 753 A.2d at 227-28. The witness, Dr. Margaret Carver, examined the child victims "five or six years after the alleged abuse" occurred. Id. at 56, 735 A.2d at 230. Dr. Carver testified that although "she found no evidence of physical trauma...the absence of physical trauma did not prove that the abuse had never occurred" due to the physical attributes of the area penetrated and the passage of time. Id. 562 Pa. at 51, 753 A.2d at 228. The Court rejected the appellant's argument that the testimony improperly bolstered the victims' credibility. In doing so the Court stated,

> Dr. Carver was neither asked for, nor did she express, any opinion as to whether the children were telling the truth about being sexually abused. Her testimony only explained the significance of the results of the physical examination. *See Johnson*, 690 A.2d at 277. Moreover, Dr. Carver's testimony regarding her physical findings was inconclusive as to whether any abuse had even occurred. Thus, we do not agree that the expert impermissibly bolstered the children's credibility.

12

Id., 562 Pa. at 54-55, 753 A.2d at 229-230. The same reasoning applies here since Nurse Bangs did not offer an opinion as to K.S.'s truthfulness, her testimony was only offered to explain the significance, or lack thereof, of the absence of injuries and her testimony was, as trial counsel argued to the jury, inconclusive as to whether sexual abuse occurred. (N.T. 4/28/15, at 106-107; N.T. 4/30/15, at 11.)

Petitioner's reliance on Maconeghy in support of his position that Nurse Bangs' testimony was objectionable is misplaced. In Maconeghy, the Commonwealth presented the testimony of Dr. Quentin Thomas Novinger, M.D., a pediatrician who had evaluated a purported victim to determine whether she had suffered from sexual abuse. Maconeghy, 642 Pa. at 772, 171 A.3d at 708 (Pa. 2017). "Although Dr. Novinger found no evidence of abuse in the physical exam...", he nevertheless testified that "[t]he history [the victim] provided to [him] pretty clearly indicated that [the victim] was sexually abused." Id., 642 Pa. at 773, 171 A.3d at 708 (internal quotation marks and citations omitted). The Court held that Dr. Novinger's testimony served to improperly bolster the credibility of the victim and invaded the province of the jury and was therefore inadmissible. Id., 642 Pa. at 780, 171 A.3d at 713. The facts of this case are clearly distinguishable. Here, Nurse Bangs did not express an opinion that K.S. was a victim of sexual assault based upon her and/or her mother's accounts as was the case in Maconeghy.

Assuming, *arguendo*, that the challenged testimony was objectionable, Petitioner cannot establish prejudice since, as previously stated, Nurse Bang's testimony regarding her physical findings was inconclusive as to whether any abuse had occurred. Moreover, the evidence against Petitioner was overwhelming (See *Infra*, at 2-5). As a result, Petitioner cannot establish that there is a reasonable probability that the outcome of the trial would have been different had trial counsel successfully precluded the challenged testimony.

13

**Nurse Bangs' Testimony Regarding Internal Sex Abuse Statistics from the Children's Hospital of Philadelphia**

During her testimony, Nurse Bangs testified that the Children's Hospital of Philadelphia ("CHOP") maintained a database regarding the examinations performed by the CHOP sexual assault response team since its inception in 2009. She further testified that, of the 600 cases in that database, only 21 percent of those cases showed any type of evidence of physical abuse. (N.T. 4/28/15, at 106-107.) Petitioner asserts that trial counsel was ineffective for failing to object to this testimony based on the Commonwealth's failure to provide the statistics to the defense in discovery. Amended Petition, ¶ 15b; Second Amended Petition/Rule 907 Response, ¶ 16; Statement, ¶ 2. The thrust of Petitioner's scant argument on this issue is that the Commonwealth was required to either provide the internal CHOP statistics to the defense in discovery or as part of the expert report produced in discovery. Petitioner alleges that, absent this, Nurse Bangs was not permitted to testify as to the statistics.

Pre-trial discovery in criminal cases is governed by Pennsylvania Rule of Criminal Procedure 573. Commonwealth v. Santos, 176 A.3d 877, 882 (Pa. Super. 2017). The rule lists certain items and information that are subject to mandatory disclosure by the Commonwealth when they are: (1) requested by the defendant, (2) material to the case, and (3) within the possession or control of the prosecutor. Id. Mandatory discovery, as it potentially relates to this case, includes:

> (a) Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth;
>
> ...
>
> (e) any results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant that are within the possession or control of the attorney for the Commonwealth.

Pa.R.Crim.P. 573(B)(1)(a), (e).

14

Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), also governs pre-trial discovery in criminal matters. In Brady, the United States Supreme Court held "...that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S. Ct. at 1196-1197, 10 L. Ed. 2d at 218 (1963). The Court later extended the duty to disclose to cases where there has been no request by the accused. United States v. Agurs, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399, 49 L. Ed. 2d 342 (1976). Brady material includes impeachment evidence as well as directly exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3381, 87 L. Ed. 2d 481 (1985). Evidence is "material" for Brady purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler v. Greene, 527 U.S. 263, 281, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481, 494 (1985)) (internal quotation marks omitted); Commonwealth v. Burke, 566 Pa. 402, 411, 781 A.2d 1136, 1141 (Pa. 2001). Moreover,

> The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

Id. (citation and quotation marks omitted). The necessary components of a Brady violation are:

    (1)  the evidence must be favorable to the accused, either because it is exculpatory or because it impeaches;

    (1)  the evidence must have been suppressed by the prosecution, either willfully or inadvertently; and

    (3)  prejudice must ensue.

15

Commonwealth v. Burke, 566 Pa. at 411, 781 A.2d at 1141 (Pa. 2001).

In the instant case, the statistics maintained by CHOP showing that only 21 percent of the cases handled by CHOP's sexual assault response team since its inception in 2009 showed any type of evidence of physical abuse is not "evidence favorable to the accused" for purposes of Pa.R.Crim.P. 573(a) or "exculpatory" for purposes of Brady and Burke. Rather, the evidence rebuts the inference Petitioner would have had the jury draw, that the lack of physical injury supports the conclusion that no sexual assault occurred. Nor are the challenged statistics subject to mandatory disclosure under Pa.R.Crim.P. 573(B)(1)(e) since they are neither "scientific tests" nor "expert opinions." Since the statistical data does not constitute mandatory discovery, trial counsel cannot be deemed to be ineffective for failing to interpose an objection based on a violation of the law regarding mandatory discovery. Trial counsel is not required to interpose a frivolous objection. Commonwealth v. Chmiel, 612 Pa. 333, 468, 30 A.3d 1111, 1190 (Pa. 2011); Commonwealth v. Groff, 514 A.2d 1382, 1386 (Pa.Super. 1986).

Petitioner has also failed to offer any authority to support the proposition that Nurse Bangs was required to include the statistical data in her expert report which the Commonwealth voluntarily turned over in discovery. The rule regarding discretionary discovery is also of no avail to Petitioner. Rule 573(B)(2), addresses discovery available at the discretion of the Court, and provides in pertinent part:

> (b) If an expert whom the attorney for the Commonwealth intends to call in any proceeding has not prepared a report of examination or tests, the court, upon motion, may order that the expert prepare, and that the attorney for the Commonwealth disclose, a report stating the subject matter on which the expert is expected to testify; the substance of the facts to which the expert is expected to testify; and a summary of the expert's opinions and the grounds for each opinion.

16

Pa. R. Crim. P. 573(B)(2)(b). Here, there is no allegation that there was a motion and order for the expert to prepare a report containing the grounds for each of her opinions in accordance with Pa. R. Crim. P. 573(B)(2)(b).

Assuming, *arguendo*, that the statistics should have been provided to the defense, Petitioner's claim of ineffective assistance of counsel based on the pretrial nondisclosure of those statistics, cannot support Petitioner's request for PCRA relief since he has failed to plead and the record does not reveal any facts sufficient to demonstrate prejudice. He has not alleged that the statistics are inaccurate or impeachable or otherwise articulate how the result of the proceedings would have been different had the statistical evidence been excluded. As previously stated, the evidence against Petitioner was overwhelming. As a result, Petitioner cannot establish that there is a reasonable probability that the outcome of the trial would have been different had trial counsel successfully precluded reference to CHOP's internal sexual assault examination statistics.

**Proposed DNA Expert Witness Katherine L. Cross**

Petitioner alleges that DNA expert witness Katherine L. Cross should have been called as a witness for the defense "to educate the jury regarding DNA evidence from the defense perspective, to rebut the prosecution's DNA evidence, to explain in an exculpatory manner how DNA evidence could have been deposited upon the person of K.S., and to explain whether 'saliva' was actually found, or not, with any certainty on the person of K.S." Amended Petition, ¶ 15c.; Second Amended Petition/Rule 907 Response, ¶ 17; Statement, ¶ 3. To establish a claim of ineffective assistance of counsel for failing to call a witness, a petitioner must prove that the witness's testimony would have materially aided him at trial. Commonwealth v. Baumhammers, 625 Pa. at 382, 92 A.3d at 725. In support of his claim, Petitioner attached a report from Ms. Cross, dated June 3, 2019, wherein she analyzed the report

17

of the Commonwealth's serology and DNA expert, Thomas Walsh, dated February 25, 2015. Second Amended Petition/Rule 907 Response, Exhibit "A".

Ms. Cross did not conduct any independent testing of the swabs taken during the physical examination of K.S. Ms. Cross's report relates solely to her analysis of the Commonwealth's expert's report and general DNA information. Paragraph 1 of the report reiterates the Commonwealth's expert's test results regarding the absence of seminal fluid and sperm cells on some of the swabs. The Commonwealth's expert testified to those results. (N.T. 4/28/15, at 129-130.) Paragraph 2 of the report reiterates the Commonwealth's expert's test results regarding the presence of saliva on rectal swabs, vulva swabs and perianal swabs and notes that the test is presumptive and that bodily fluids other than saliva, such as fecal material and bacteria, can produce positive results, all of which the Commonwealth's expert conceded on cross-examination. (N.T. 4/28/15, at 137-139, 143.) Paragraph 3 of the report reiterates the test result regarding the presence of male DNA markers on the swabs that had also tested positive for the presence of saliva and notes that the test can only detect male DNA, not female DNA, and that those DNA markers are present in all males in a paternal lineage. All of this information was provided to the jury during the testimony of the Commonwealth's expert. (N.T. 4/28/15, at 133-134, 140, 146.) Paragraph 4 of the report reiterates the test results regarding the absence of male DNA on the rectal swabs. The Commonwealth's expert testified to those results. (N.T. 4/28/15, at 131.) Paragraph 5 of the report reiterates the test results regarding the presence of DNA which was not that of Petitioner on a perianal swab. The Commonwealth's expert testified to the result of that test. He further testified that Petitioner was excluded as a contributor, explaining that "excluded" meant that it was not Petitioner's DNA or there was insufficient data to include him as a contributor. (N.T. 4/28/15, at 133-134.) Paragraphs 6 and 7 of the report note that the Commonwealth's expert

18

's report did not indicate the number of loci that produced the partial DNA profile consistent with that of Petitioner or any paternally linked male relative on the vulva swab which Ms. Cross states prevents her verifying the finding. At trial, the Commonwealth's expert provided the information Ms. Cross needed to verify the finding. (N.T. 4/28/15, at 132.) Ms. Cross's report does not challenge that testimony or the validity of his finding. Paragraphs 8 and 9 address the potential transfer of DNA through the shedding of skin cells, which Ms. Cross concludes is to be expected due to the fact that the victim upon whom Petitioner's DNA was found and Petitioner lived in the same residence. The possibility of DNA transfer via skin cells was elicited during the testimony of the Commonwealth's expert. (N.T. 4/28/15, at 134-135, 142-146.)[2]

To summarize, Ms. Cross's report does not contain any information that was not presented to the jury during the testimony of the Commonwealth's expert. As a result, Petitioner cannot establish that her testimony would have materially aided him at trial. Therefore, Petitioner's claim that trial counsel was ineffective for failing to call her as a witness cannot succeed. It is also important to note that trial counsel retained Ms. Cross as an expert prior to trial in order to respond to the anticipated testimony of the Commonwealth's DNA expert, a fact Petitioner concedes. Second Amended Petition/Rule 907 Response, ¶ 24c. As the above comparison of Ms. Cross's report and trial counsel's cross-examination of the Commonwealth's expert demonstrates, trial counsel was prepared to address the Commonwealth's DNA evidence and effectively utilized the information he obtained from Ms. Cross to cross-examine the Commonwealth's expert. As a result, trial counsel was able to effectively establish the substance of Ms. Cross's expert opinions and analysis through the concessions of the Commonwealth's expert, thereby transforming potential evidence from a paid defense expert into material fact conceded by the Commonwealth's

---

[2] See Answer to Amended Petition, at 12-14 for an accurate and more detailed analysis of testimony.

19

expert. Having done so, there was no need for trial counsel to call his own expert to "rebut the prosecution's DNA evidence," to "explain ... how DNA evidence could have been deposited upon the person of K.S." or to undermine the evidence regarding the presence of "saliva" as Petitioner asserts. Trial counsel's apparent strategy was sound, effective and in no way prejudiced Petitioner. Under such circumstances trial counsel cannot be found to have been ineffective.

## Conclusion

For the reasons set forth above, this Court denied Petitioner's request for PCRA relief.

BY THE COURT:

8/11/20
Date

DIANE E. GIBBONS, J.

20